**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE: ) | USDC Case No.: 2:10-cv-00860-GMN-PAL |
| ) | |
| THE LAND HOLDING GROUP, INC., ) | Bankruptcy Case No.: BK-S-07-16852-BAM |
| ) | |
| Debtor, ) | Adv. Proceeding No.: 2-08-01010-BAM |
| ) | |
| MOSHE GEDALIA, SUZIE GEDALIA, and ) M&S UNLIMITED, LLC, ) | **ORDER** |
| ) | |
| Appellants, ) | |
| ) | |
| vs. ) | |
| ) | |
| THE LAND HOLDING GROUP, INC., ) | |
| ) | |
| Appellee. ) | |

**<u>INTRODUCTION</u>**

  Before the Court is Appellants Moshe Gedalia, his wife Suzie Gedalia, and M&S Unlimited, LLC's (collectively "the Gedalias") appeal of a Judgment of the Bankruptcy Court. The Gedalias filed an Opening Brief on November 15, 2010 (ECF No. 29). The Land Holding Group, Inc. ("LHG") is the Appellee in this proceeding and filed its Answering Brief on December 13, 2010 (ECF No. 33). The Gedalias filed their Reply Brief on December 22, 2010 (ECF No. 35).

  The Bankruptcy Court rendered a decision dismissing all of the Gedalias' claims against LHG. (AER[1] 138–164.) The Bankruptcy Court granted LHG's counterclaim for tortuous

/ / /

---

[1] "AER" refers to Appellants Excerpts of Record which can be found at docket entries 29 and 31.

interference with prospective economic advantage, and awarded damages of $4,975,466.00 along with costs. (*Id.*)  For the foregoing reasons, the Court affirms in part and reverses in part the Bankruptcy Court's decision.

## FACTS AND BACKGROUND

The Court has compiled the following facts from the Bankruptcy Court's findings of fact, as well as from the Appellants' and Appellee's Excerpts of Record.

### Ron Amiran

The Bankruptcy Court characterized Ron Amiran as the central figure in this story as he has connections to both parties in this litigation.  Amiran worked for the Gedalias and was also at one time a founding partner of LHG.  He also controlled other companies referenced in this litigation including Mesonic America and ITC Homes.  Amiran pled guilty to bank fraud in the 1990s. (AER 139:15–16.)

### The Land Holding Group

LHG is a corporation originally founded by Ron Amiran. (AER 140:8–9.)  In 2005, three investors, David Melamed, Shawn Manshoory, and Jacob Bachar purchased LHG from Amiran as a corporate vehicle to develop real estate in the Southwestern United States. (*Id.* at 140:5–10.) LHG's three new principals tasked Amiran to find suitable land to develop luxury houses. (AER at 140:13–14.)  Amiran, through his entity called Mesonic America, found a 51 acre plot of land outside of Tucson, Arizona which LHG purchased for $1.6 million. (*Id.* at 140:15–18.)

LHG called the new development "Mansions at Spanish Trails." (*Id.* at 141:5.)  In September 2005, LHG sought a $5.5 million commitment for construction financing from First National Bank of Arizona ("FNBA"). (*Id.* at 141:9–11.)  LHG and FBNA never signed a contract for the loan.  However, Chip Shaw, Senior Vice President at FBNA stated in his deposition that he was prepared to recommend to the loan committee that the loan be approved. (*Id.* at 357:3–8.)  LHG closed on the 51 acre proposed site of the Mansions at Spanish Trails

before the $5.5 million construction financing was completed. (AER at 142.)

**Amiran and M&S Unlimited**

Prior to LHG's proposed development of the Mansions at Spanish Trails, Amiran had significant dealings with the Gedalias. (*Id*. at 142:13–14.) Moshe Gedalia first met Amiran through the Gedalias' company M&S Unlimited, LLC ("M&S"). (*Id*. at 142:14–15.) M&S and Amiran's other company, ITC Homes, formed a partnership where M&S provided the capital investment and ITC provided the construction and development know-how to build and market a community named the "Santa Rita Acres Estates." (*Id*. at 143:4–7.) ITC arranged a $15 million loan from FNBA to finance that housing project. (*Id*. at 143:9–10.)

There was no business relationship or similarity of purpose between the Santa Rita Acres Estates and the Mansions at Spanish Trails developments. (*Id*. at 143:11–13.) Santa Rita Acres Estates was comprised of moderate single-family homes, while Mansions at Spanish Trails was to be made up of houses ranging from $1.5 – $2.5 million. Additionally, the two developments were roughly 20 miles apart from each other. (*Id*. at 143:13.)

**Amiran and Gedalia Disagreement**

Soon after the initial success of the Santa Rita Acres Estates, Gedalia became convinced that Amiran was not paying the proper amount of money to M&S. (*Id*. at 143:16–17.) Gedalia became suspicious that Amiran was diverting money from ITC to other Amiran controlled companies. (*Id*. at 143:17–18.) As a consequence, the Gedalias sued ITC and various Amiran-related entities (including LHG) on November 14, 2005. (*Id.* at 143:3–5.)

**Gedalia Lawsuit and LHG**

The Gedalias sued LHG, *inter alia*, because they believed that Amiran diverted money from M&S, moved the money through various Amiran companies, and then used that money to/

///

///

1   purchase the land in Tucson for LHG.[2] (SER[3] 44:2–8.)  However, the Gedalias' attorney

2   admitted the speculative nature of their claim in court: "Can I tell you how he [Amiran] did it

3   (i.e., divert money)?  No . . . ." (AER at 150:19–121 (citing Trial Transc. 0930092, P.93).)

4           Soon after the lawsuit was filed against LHG, the Gedalias flew to Arizona to speak with

5   FNBA Sr. VP, Chris Shaw[4] (SER at 34:2–7) despite the fact that Shaw was not the loan officer

6   for Gedalias' Santa Rita Acres Estates project (*Id.* at 47.)  Gedalia admitted in his March 5, 2008

7   deposition, that he did not discuss anything about his own Santa Rita Acres Estates project loan

8   in the meeting with Shaw. (*Id.* at 39:20–22.)  In that deposition, which was read at trial, Gedalia

9   admitted that the purpose for the meeting with Shaw was to tell Shaw not to loan money to

10  Amiran because Amiran was "playing" with the Gedalias' money. (*Id.* at 36:14–18.)  During the

11  meeting, Gedalia informed Shaw about the lawsuit against LHG, but did not provide Shaw with

12  a copy of the lawsuit. (AER at 361:8–11, 363:5–7.)  Subsequent to the meeting, Shaw stated in

13  an email to Amiran that the loan was denied because of the pending litigation. (*Id.* at 356.)

14  **Fallout from the Lawsuit**

15          Both ITC and LHG filed for bankruptcy soon after the Gedalias filed their lawsuit against

16  the two companies — ITC on January 11, 2006 in the District of Arizona, and LHG in Las

17  Vegas on October 22, 2007. (*Id.* at 145:17–19.)  The Arizona Bankruptcy Court ousted the

18  Nevada receiver, and re-vested ITC's assets under the control of ITC, as debtor in possession.

19  That Bankruptcy Court appointed an examiner named Christopher Linscott, who examined ITC

20  and its financial and accounting practices (the "Linscott Report").  Linscott noted that it did not

21

22

---

[2] This belief may have been fueled by a three-day $300,000 bridge loan from ITC to Tuesday Investments to fund the
23  purchase of the land for the Mansions at Spanish Trails, although the Bankruptcy Court found that there was no evidence that
the Gedalias knew of this transaction when they sued LHG. (AER at 144:15–18.)
[3] "SER" refers to Appellee's Supplemental Excerpts of Record which can be found at docket entry 33.
24  [4] The Bankruptcy Court found that the Gedalias filed a lis pendens on LHG's land on February 13, 2006. (AER at 145:1.)
The Bankruptcy Court also found that after the lis pendens was filed, the Gedalias traveled to meet with Shaw. (*Id.* at 145:2–
25  3.)  However, this appears to be an incorrect timeline of events as the Gedalias meeting with Shaw was in mid-November,
2005. (AOB at 8, n.8.)  Thus, the Gedalias could not have told Shaw about the lis pendens in their meeting.

seem like any fraudulent transactions took place. (*Id.* at 413.)  However, Linscott stated that Amiran or related parties took advantage of corporate opportunities through the purchase of the Mansions at Spanish Trails. (*Id.*)  Linscott also stated that it is clear that ITC took advantage of other corporate opportunities for the benefit of M&S "when there was no apparent reason to do so." (*Id.*)  The Linscott Report was inconclusive in regard to whose funds were used to take advantage of the corporate opportunities. (*Id.*)

On January 28, 2007, a settlement was entered into between the Gedalias, Amiran, and several of Amiran's companies. (SER at 81–82.)  However, noticeably absent from the settlement agreement is LHG. (*Id.*)  Scott Gibson, ITC's attorney during the settlement negotiations, testified that an agreement was reached, but there would be no dismissal of claims against LHG and Title Security Company. (AER at 339b:3–6.)  The ITC settlement was filed as part of the reorganization plan; however, the Tucson housing market deteriorated in 2007 and 2008, and ITC's case was converted into a Chapter 7 liquidation. (*Id.* at 146:12–15.)

**Legal Proceedings Against LHG**

The Gedalias conducted settlement negotiations parallel to those conducted with ITC, but both sides could not reach an agreement. (*Id.* at 146:19–21.)  After settling with Amiran, the Gedalias proceeded with their case against LHG, even though it was their belief that Amiran was the one who actually took their money. (*Id.* at 146:21–23.)

**The Bankruptcy Court's Decision After Trial**

After the trial, the Bankruptcy Court took the following matters under submission: (1) the Gedalias' claims for RICO, unjust enrichment and fraud, and (2) LHG's counterclaims for abuse of process, intentional interference with prospective economic advantage and its request for quiet title. (*Id.* at 148:4–8.)  The Court found that all of the Gedalias' and M&S's claims fail because of their failure to establish any right to a constructive trust on LHG's assets. (*Id.* at 148:9–10.)  Thus, the Court entered judgment for LHG on all claims brought by the Gedalias

and M&S in the original complaint. (*Id*. at 148:10–11.)  The Court also found in LHG's favor in regard to its counterclaim for intentional interference with prospective economic advantage, and awarded LHG $4,848,257.00, as well as prejudgment interest on that sum of $127,179.00. (*Id*. at 148:11–15.)

## **DISCUSSION**

**A.     Legal Standard**

Bankruptcy appeals are governed by 28 U.S.C. § 158. "Subsection (a) gives the district courts authority to hear appeals from final . . . orders of the bankruptcy courts." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 252 (1992).

This Court reviews the Bankruptcy Court's conclusions of law *de novo* and its findings of fact for clear error. *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1213 (9th Cir. 2002); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 580–81 (1985) (stating that the task of appellate tribunals generally—in regard to questions of fact— is to determine whether the trial judge's conclusions are clearly erroneous).  Mixed questions of law and fact are reviewed de novo. *In re BEC West, L.P.*, 319 F.3d 1166, 1170 (9th Cir. 2003);  *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998).

"A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573.  This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. *Id*.  "In applying the clearly erroneous standard to the findings of a . . . court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Id*. (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969).  "If the . . . court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even

though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* at 574 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)).

**B.    Analysis**

### 1.    *Did the Bankruptcy Court Err as a Matter of Fact and Law in Finding the Gedalias Liable for the Tort of Interference with Prospective Economic Advantage?*

The Gedalias argue that the Bankruptcy Court erred as a matter of fact and law when it found them liable to LHG for tortuously interfering with the financing for LHG's Mansions at Spanish Trails project. The Gedalias claim that the Bankruptcy Court erred in the following ways: (1) that the Bankruptcy Court's factual findings regarding the meeting with Shaw were clearly erroneous; (2) the statements made to Shaw were truthful, which prevents LHG from establishing a cause of action for tortious interference; (3) the Gedalias did not act improperly; (4) the court erred as to the Gedalias' motive because they, in good faith, asserted a legally protected interest that they believed could be impaired; and (5) the Gedalias did not waive any examination into whether their conduct was improper, or truthful when they failed to raise the issues as affirmative defenses. (Appellants' Opening Br. ("AOB") 30:7–8, 32:18–19, 38:3, 40:16–17, 42:14–19, ECF No. 29.)  LHG argues that the Bankruptcy Court reached the correct decision and that the Court's decision was justified by the evidence presented at trial.

### a.    Bankruptcy Court's Factual Findings Relating to the Meeting with Chip Shaw

The Gedalias claim that the Bankruptcy Court's factual findings are erroneous in regard to whether FNBA *only* learned about the "pending litigation" from the Gedalias, and that Mr. Gedalia told Shaw about Amiran's prior criminal history at the meeting.

In Shaw's deposition he was asked, "[a]nd I believe you testified—correct me if I'm

wrong—that you learned about the lawsuit from Moshe Gedalia?" (AER at 361:8–10.)  Shaw's response was "yes." (*Id.* at 361:11.)  Shaw admitted that the Gedalias never gave him a copy of the documents relating to the lawsuit. (*Id.* at 363:5–7.)  This is sufficient to show that Shaw learned of the "pending litigation" during his conversation with the Gedalias.  It is true that FNBA could have learned of the litigation from public records, or sources other than the Gedalias, but the facts adduced at trial demonstrated otherwise.  Thus, the Bankruptcy Court was justified in finding that FNBA learned of the "pending litigation" from the Gedalias and the factual finding on this issue is not clearly erroneous.

Next, the Gedalias argue that the Court's finding that Shaw first learned about Amiran's criminal history during this meeting with Gedalia was clearly erroneous.  Shaw testified at his deposition that he did not recall anything else that Mr. Gedalia told him at the meeting about Mr. Amiran. (AER at 366:9–11.)  Gedalia's own deposition testimony reveals that he did actually make disparaging remarks about Amiran, although they fell short of actually stating what Mr. Amiran's criminal history entailed. (*See* SER 36: 7–21 (When asked why he went to see Shaw, Gedalia answered: "to tell them about what's going on with Ron.  He take money, and he play with our money and all those things, and we go there, and sit with him . . . [w]e explain what Ron is doing.  Be careful.  Don't give him everything until we know what's going on.")

The Gedalias also argue that FNBA had actual notice of Amiran's prior conviction by at least July 13, 2005 as seen in a series of e-mails. (*See* AER at 131–137).  LHG contests the submission of these e-mails as they were never submitted into evidence in the bankruptcy court.  Regardless, there is no evidence in the trial record that supports the Bankruptcy Court's finding that Shaw first learned about Amiran's criminal history at their meeting.  Therefore, any finding by the Bankruptcy Court that Shaw first learned about Amiran's criminal history at their meeting appears to be clearly erroneous.

However, this error does not change the legal conclusion of the Bankruptcy Court.  Mr.

Gedalia's testimony confirms that he did discuss Amiran's character with Shaw.  Indeed, Mr. Gedalia cautioned Shaw to be careful because Amiran was basically a thief.  Therefore, even if the Bankruptcy Court committed an error in finding that Shaw first learned about Amiran's prior criminal history from Gedalia, it does not change the Court's reasonable factual finding and legal conclusion that FNBA's decision to cancel Amiran's loan was based on the conversation between Gedalia and Shaw.

### b.    Tortious Interference with Prospective Economic Advantage

The Gedalias' remaining arguments have to deal with whether or not the Bankruptcy Court properly applied the law with regard to the tort of interference with prospective economic advantage.  The Gedalias argue that the Bankruptcy Court improperly shifted the burden to them to prove affirmative defenses that should actually be factors to consider when determining if a party's conduct was improper.  These include whether or not the party was truthful and whether or not the party acted in good faith.  They also argue that the Court did not correctly apply the law when it determined that the interference was improper.  The Court addresses each of these arguments in turn and begins with a review of the law and then the Bankruptcy Court's findings.

### i.    Legal Standard

To establish a claim for tortious interference with prospective economic advantage, a claimant must prove "the existence of a valid business expectancy; the interferer's knowledge of the expectancy; intentional interference inducing or causing a termination of the expectancy; and resultant damage to the party whose expectancy has been disrupted." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1009 (9th Cir. 2010) (applying Arizona law) (citing *Wallace v. Casa Grande Union High School Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 494 (Ariz. Ct. App. 1995)).[5]

---

[5] Arizona law applies to this dispute because the parties have so stipulated.  This also conforms with Nevada law that holds that the applicable law is "the law of the state that has the most significant relationship to the occurrence and the parties." *GMC v. Eighth Judicial Dist. Court of Nev.*, 134 P.3d 111, 116 (Nev. 2006).

In Arizona, the plaintiff "must establish that the interference was improper, as determined under a seven-factor test that Arizona courts have adopted from the Restatement of Torts." *Telesaurus*, 623 F.3d at 1009 (citing *Bar J Bar Cattle Co., Inc. v. Pace*, 763 P.2d 545, 547–48 (Ariz. Ct. App. 1988). The seven factors in Restatement (Second) of Torts § 767 that the court should consider are (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. *Bar J Bar Cattle*, 763 P.2d at 548; *see* Restatement (Second) of Torts § 767. Of these seven factors, the two "deserving the most weight are the nature of the actor's conduct and the actor's motive." *Mann v. GTCR Golder Rauner, L.L.C.*, 483 F.Supp. 2d 864, 872 (D. Ariz. 2007) (quoting *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 32 (Ariz. 2002)).

### ii.   Factual Findings

In the instant case, the Bankruptcy Court found that a business expectancy was established between LHG and FBNA, based on a signed letter of intent with the relevant loan terms, as well as a "preflight memorandum." (AER at 156:15–16.) Next, the court found evidence that the Gedalias had knowledge of the business expectancy—they traveled to Arizona to inform and warn Shaw about the lawsuit against Amiran and LHG, and of Amiran's past. (*Id.* at 156:17–19.) Furthermore, the Bankruptcy Court found that there was a causal connection between Gedalia's intentional meeting with Shaw and the termination of LHG's business expectancy because Shaw confirmed to Amiran in an email that the lawsuit and the revelations about Amiran caused FNBA to cancel the loan process. (*Id.* at 156:19–22.) Finally, the Bankruptcy Court found that LHG was damaged by the intentional acts of the Gedalias because

1    LHG lost the FNBA loan, was unable to obtain new financing, and consequently filed for

2    bankruptcy protection. (*Id.* at 156:22–24:2.)

3               **iii.    Burden Shifting and Waiver of Defenses**

4           The Gedalias argue that the Bankruptcy Court erred by shifting the burden and requiring

5    them to prove that their actions were not improper.  The Gedalias contend that the Bankruptcy

6    Court applied the incorrect version of the Restatement of Torts, which treated this cause of

7    action as a prima facie tort, subject to the defense of privilege.  As the Gedalias point out, the

8    Restatement of Torts is no longer the law in Arizona; currently Arizona follows the Restatement

9    Second of Torts.  The Gedalias contend that the Restatement Second significantly altered the

10   approach taken by the Restatement (First), shifting the focus from whether the conduct was

11   "privileged" to whether the defendant had acted "improperly."

12          The two parties disagree as to the proper standard in Arizona regarding privilege.  The

13   Gedalias contend that Restatement Second of Torts sections 768 through 773 are additional

14   factors that the court must take into account when determining if an interference is improper.

15   LHG argues that sections 768 through 773 are affirmative defenses that must be pled and proven

16   by the defendant.  However, this Court need not determine the issue conclusively because even

17   if the Court concludes that the factors are not affirmative defenses, the Gedalias' argument still

18   fails, as explained in sections B.1.b.iii.a–c.

19          There is little to no evidence that the Gedalias argued to the Bankruptcy Court that

20   sections 768 through 773 of the restatement should apply and that it was defendants' burden to

21   prove that plaintiffs did not possess a privilege.  The issue appears to be raised for the first time

22   in their post-trial brief.  However, even when they did explain that the statements made by

23   Gedalia to Shaw were believed to be truthful, there was no argument that under either the

24   Restatement Second of Torts or Arizona law this fact was a bar to a finding of improper

25   interference. (AER at 279.)  They merely argued that LHG "did not present any evidence that

the Gedalias lacked sufficient justification or privilege to file the lawsuit," but failed to provide a legal justification. (*Id.* at 279:19–21.)  While they did argue that there was no evidence that the lawsuit was meritless or that they made defamatory remarks and claimed that truth is a defense to defamation, they did not reference the Restatement Second of Torts and Arizona law or argue that as to the tort of tortuous interference with a prospective economic advantage, it was not their burden to prove truthfulness or good faith. (*Id.* at 280.)

After trial, these arguments were raised before the Bankruptcy Court in the Gedalias' Rule 59 Motion to Amend the Judgment.  The Bankruptcy Court found that the Gedalias waived these arguments or defenses because they never brought them up at trial or in the moving papers.  Thus, the Bankruptcy Court refused to alter or amend its judgment because of the new issues presented. *Cf. Ball v. Interoceanica Corp.*, 71 F.3d 73, 76 (2d Cir. 1995) ("[A] trial court should not grant a new trial merely because the losing party can probably present a better case on another trial.")

The issue raised in this appeal is not much different.  Counsel for the Gedalias even admitted in the opening of their Motion to Amend the Judgment that

> [t]his motion is being made because the issue of whether the Gedalias, in truthfully presenting the potential lender, FNBA, with information about litigation pending against Ron Amiran, ITC and LHG, and about Amiran's criminal past, constituted the tort of interference with the prospective economic advantage *was not fully presented to this Court*, resulting in manifest errors of fact and law and a manifest injustice.

(AER 240).  Accordingly, the Court finds that the Gedalias waived these arguments.

Nevertheless, the Court finds these arguments (if not waived) are meritless for the following reasons.

### a.    Truthfulness

The Gedalias claim that even if they did disclose the fact that Amiran was a felon and the

existence of a lawsuit, since this information was true, Mr. Gedalia did nothing improper as the truthfulness of the information negates any impropriety. *See Thompson v. Paul*, 402 F.Supp. 2d 1110, 1116–17 (D.Ariz. 2005), *aff'd on other grounds*, 547 F.2d 1055 (9th Cir. 2008); *see also* Rest. 2d. Torts § 772(a). They argue that the Bankruptcy Court's finding did not ever consider the truthfulness of the information provided by Gedalia.

However, the possible truthfulness of that information is not sufficient to negate the fact that Gedalia also told Shaw that Amiran was stealing his money. The Bankruptcy Court found that there was never any evidence proving that Amiran took Gedalias' money. Therefore, the bankruptcy judge, as the fact finder, did not believe that all of the information provided by Gedalia to Shaw was truthful. The judge believed that some of the information was untruthful and determined that the nature of Gedalia's conduct and his motive were improper. This Court likewise finds that not all of the information Gedalia provided to Shaw was truthful and therefore the privilege, even if it were not waived, would still not preclude the Bankruptcy Court's legal conclusion that there was an improper interference.

### b.   Good Faith

The Gedalias also contend that they had a good faith basis for commencing their lawsuit against LHG and that they had a duty to disclose to the bank any change in its or the guarantors' financial situation or any material pending lawsuits. Rest. 2d. Torts § 773 provides that:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

/ / /

/ / /

Rest. 2d. Torts § 773.  Comment a to § 773 states,

> [t]he rule stated in this Section gives to the actor a defense for his legally protected interest.  It is of narrow scope and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means.

First, the Gedalias' argument that it had a good faith basis to file the lawsuit is automatically dismissed because the Bankruptcy Court did not determine an improper interference occurred based upon the filing of the lawsuit, but rather because of the information provided by Gedalia to Shaw during their meeting.

Second, the Gedalias' contention that they had a duty to advise FNBA about the lawsuit does not establish good faith.  If Mr. Gedalia had a good faith belief that he was required to share the information about the lawsuit with FNBA, the proper person to convey the message to would have been to his own loan officer, not Shaw who had nothing to do the with his project and the loan from the bank to ITC.  Accordingly, the Court does not find that the Gedalias had a good faith basis for their trip to Arizona and their communication to FNBA through Shaw.

### c.    Means of Interference

The Gedalias also argue that the Bankruptcy Court erred when it only found their motive to be improper.  They argue that the Court also needed to determine that their means of interference were also improper.  *See Strojnik v. General Ins. Co. of America*, 36 P.3d 1200 (Ariz. Ct. App. 2001) (the court addressed means and motive separately).  The Gedalias' argument is that under Restatement Second of Tort section 767 comment (c) "[t]he nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not" but also that "the issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it."  The Gedalias claim that because there was no evidence that they violated any law, or engaged in duress, coercion, fraud

or concealment and only that they communicated truthful information to the bank, the means of interference cannot be deemed improper.

Contrary to the Gedalias' argument, the orders from the Bankruptcy Court appear to convey that it found their means were improper.  Specifically, in the order when the Bankruptcy Court addresses the factor to be examined to determine if the interference was proper, the Court states:

> However, not all factors need be weighed equally.  Factors deserving the most weight are the nature of the actor's conduct and the actor's motive. . .  Applying these factors, the court finds that [the Gedalias'] interference was improper.  The factors "deserving the most weight" weigh strongly against the Gedalias.

(AER at 157:23–158:5.)  While the Court never explicitly found that the "means were improper," it did consider the "nature of the actor's" conduct and that it weighed against the Gedalias.  It appears from the Bankruptcy Court's order that it found that the means of the interference, Gedalias' flight to Arizona to have a conversation with Mr. Shaw, was improper.

Further, even if the Bankruptcy Court did not implicitly find that the means were improper, all that is required of the fact finder is to examine all the factors to determine if the interference was improper.  The judge, as the fact finder, had the ability to observe the witnesses and manner in which they testified.  The court did not find the Gedalias to be truthful or credible witnesses.  The judge stated that he took the factors into consideration to find that the interference was improper.  This is all that one can ask of a fact finder.  The fact finder does not need to give every reason why it believes the facts show one thing or another.  The burden is on the Gedalias, on appeal, to show that the facts as found by the judge were clearly erroneous. They have not done so.

This Court now explicitly finds that the means of interference were improper.  First, untruthful information was conveyed.  Furthermore, if the Gedalias were just trying to comply

with a perceived duty to disclose truthful information to Shaw, there were many more likely means of accomplishing this.  Gedalia could have sent a letter or e-mail to his own loan officer at FNBA stating that there is a lawsuit pending against one of their prospective clients.  Instead, Gedalia specifically sought a face-to-face meeting with Shaw to discuss LHG's Mansions at Spanish Trails loan.  The Gedalias claim that their flight from Los Angeles to Phoenix for a meeting with a bank official who had nothing to do with the loan they claim to be protecting was not an improper means is clearly not worthy of credit.  Accordingly, the bankruptcy judge did not believe the Gedalias' story (AER at 316) and this Court accepts that finding.

### iv.   Improper Interference with a Prospective Economic Advantage

After taking into account the Gedalias' asserted defenses and privileges and finding them meritless, this Court looks at the seven (7) factors adopted by the Arizona Supreme Court and determines that there was an improper interference with a prospective economic advantage. Gedalia flew to Arizona to speak with Shaw about a loan which had nothing to do with the Gedalias' project.  Even if Gedalia conveyed some truthful information to Shaw, his motivation and conduct when conveying the message was not in good faith.  Mr. Gedalia also conveyed information that was not shown to be truthful when he told Shaw that Amiran was diverting money to LHG.  Accordingly, the Court affirms the Bankruptcy's Courts holding that the Gedalias are liable for damages to LHG for intentional interference with the prospective economic advantage of LHG.

### 2.   *Did the Bankruptcy Court Err in its Damage Conclusion?*

The Bankruptcy Court awarded LHG $4,848,267 for lost profits, and $127,179 in prejudgment interest. (AER at 164:1–2.)  These numbers were based on the calculations of Keith Bierman, LHG's damages expert.  Bierman used "the lost profits methodology" for calculating

/ / /

/ / /

the lost profits. [6]  The Gedalias first argue that the tort they committed (their communication to Shaw) is not the direct or proximate cause of the damages found by the Court.  Next, the Gedalias argue that the calculated damages are too speculative because Bierman's report assumed ITC and Amiran would be the borrower and developer.

In Arizona, "[r]ecovery in a tort action is limited to those damages which are the direct and proximate consequences of the defendant's wrongful acts." *Valley Nat'l Bank v. Brown*, 517 P.2d 1256, 1260. "The proximate cause of an injury is defined in Arizona as 'that, which is a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred.'" *Shelburg v. City of Scottsdale Police Dept.*, No. CV-09-1800-PHX-NVW, 2010 WL 3327690 at *9 (D.Ariz. Aug. 23, 2010) (quoting *Saucedo v. Salvation Army*, 24 P.3d 1274, 1278 (Ariz. Ct. App. 2001)).  Arizona allows recovery of lost profits "'where evidence is available to furnish a reasonably certain factual basis for computation of probable losses . . . even where a new business is involved.'" *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 680 P.2d 1235, 1245 (Ariz. Ct. App. 1984) (quoting *Earle M. Jorgensen Co. v. Tesmer Manufacturing Co.*, 459 P.2d 533, 538 (Ariz. Ct. App. 1969)).

The Gedalias contend that the lawsuit they filed against LHG is the proximate cause of LHG's damages, based on the Bierman Report and Bierman's testimony because both premised damages as being caused by the filing of the lawsuit. (AER at 354:11–15, 432.)  The Gedalias correctly point out that the Bankruptcy Court found that it was actually the conversation which created liability for tortious interference.

However, the Gedalias incorrectly confuse the calculation of damages with the proximate cause of an injury.  In this case, the conversation (wrongful act) resulted in the loss of the loan

---

[6] The lost profit methodology for calculating damages measures the difference between: a) the unimpaired stream of income or cash flow that would have been earned "but for" the event in dispute; and b) the impaired, or actual, stream of income or cash flow that was or is forecasted to be experienced. (AER at 437.)

(injury).  Damages flow from injury and are an award made to a person because of a legal wrong done to him by another. Rest. 2d. Torts § 902.  The assumptions relied on by Bierman in his damages calculation was that the lawsuit caused the loss of the loan.  His assumption was, in fact, wrong.  However, the injury did not change and was not affected by his incorrect assumption.  Since the injury did not change, the resulting damages calculation is still appropriate.  The Gedalias did not dispute, rebut or challenge the calculation at trial.

The Gedalias also argue for the first time on appeal that the calculations of the report are too speculative.  They argue that FNBC was considering making the loan to ITC and Amiran but that there was no consideration that LHG would be a party to the loan.  However, the factual record reveals that LHG could not secure a loan outside of a partnership with Amiran.  Therefore, any damage to Amiran would flow to LHG.

The calculation itself is a finding of fact that this Court reviews for clear error. *See Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991).  The Gedalias do not cite to any part of the record where they disputed the calculation at trial with their own evidence.  In fact, the Bankruptcy Court noted that the Gedalias failed to impeach [Bierman's] testimony or present other evidence of damages." (AEC 163–64.)  As such, the court finds that there was no clear error in the calculation and the damages award was proper.

### 3.   Did the Bankruptcy Court Err as a Matter of Law when it Rejected the Gedalias' claims against LHG?

The Gedalias alleged three causes of action against LHG at trial: (1) RICO, (2) Unjust Enrichment, and (3) Fraud. (AER at 147:6–9.)  The requested relief for these three actions was a constructive trust in the property LHG purchased, that is, the Mansions at Spanish Trails. (*Id*. at 149:11–12.)  The Gedalias contend that the Bankruptcy Court erred in three ways: (1) there was no release of LHG by operation of law; (2) there is no tracing requirement to establish a constructive trust; and (3) the Bankruptcy Court did not apply the correct Ninth Circuit law

regarding when an equitable interest in property is preserved against the bankruptcy trustee. This Court finds that there is a tracing requirement under Arizona law to establish a constructive trust.  As such, the Court does not find it necessary to address the Gedalias' first and third arguments.

### a.    Tracing Requirement in Regard to a Constructive Trust

A constructive trust arises by operation of law, and is generally imposed when property is acquired under inequitable circumstances, resulting in unjust enrichment of one at the expense of another. *Stoltz v. Maloney*, 630 P.2d 560, 563 (Ariz. Ct. App. 1981) (citing *Brown v. Walls*, 457 P.2d 355 (Ariz. Ct. App. 1969)).  The gist of the conduct which will lead to the imposition of a constructive trust is the wrongful holding of property which unjustly enriches the defendant at the expense of the plaintiff. *Harmon v. Harmon*, 613 P.2d 1298, 1300 (Ariz. Ct. App. 1980). Essential to the imposition of a constructive trust, therefore, is the identification of specific property, or res, in which the claimant has a direct interest. *In re Allied Gen. Agency*, 229 B.R. 190, 196 (D. Ariz. 1998) (citing *Burch & Cracchiolo, P.A. v. Pugliani*, 697 P.2d 674, 679 (Ariz. 1985) (*en banc*)).  "In other words, the claimant is required to demonstrate that the assets in question are themselves the result of ill-gotten gains from the claimant.  It is this tracing requirement which distinguishes a constructive trust from a general claim for damages." *In re Allied Gen. Agency*, 229 B.R. at 196.  The proof of a constructive trust must be by clear and convincing evidence. *Stoltz*, 630 P.2d at 563 (citing *King v. Uhlmann*, 437 P.2d 928 (Ariz. 1968)).

The Bankruptcy Court found that "the Gedalias failed to meet their burden on tracing." (AER at 149.)  The Bankruptcy Court summarized how they failed in this task:

> [The Gedalias] cannot tell the court how, or how much of, their money went to purchase the land that LHG bought.  In their papers, the Gedalias make bald assertions that this happened – but they offer no evidence of it.  They cannot point to any non-commingled funds that are

clearly theirs.   As the Gedalias' counsel admitted: "Can I tell you exactly how he did it?" – that is, how Amiran diverted money to LHG – "No."  Isaac similarly acknowledged the [sic] neither he nor his parents had any direct knowledge or proof of Amiran's thievery.  The Linscott Report likewise found no "direct evidence that costs from related-party projects such as Copper Hills Estates, *Spanish Trails*, or Regency were charged to ITC" and therefore also to the Gedalias.

(AER at 150-151)(citations omitted).

The Gedalias argue that there is no tracing requirement in Arizona.  They fault the court for citing to *In re Estate of Fishman*, 30 P.3d 140 (Ariz. App. Div. 2, 2001) because the opinion was de-published and for relying on *Amtitle Trust Co. v. Fitch*, 541 P.2d 1166 (Ariz. Ct. App. 1967).  However, the Bankruptcy Court never cited to *Amtitle* in its order.

The Gedalias rely on *Eckert v. Miller*, to assert that there is no tracing requirement under Arizona law. 111 P.2d 60 (Ariz. 1941).  The court in the 1941 Eckert case does not discuss whether or not there is a tracing requirement in Arizona.  In *Eckert*, a tenant failed to pay rent with which his landlord would have been enabled to use to redeem the landlord's property from a tax sale; the tenant then procured tax title for himself through a third party.  The court held a constructive trust arose in favor of the landlord.

This Court's review of Arizona case law leads to the conclusion that before a court can impose a constructive trust on the assets belonging to the alleged wrongdoer, the aggrieved party must trace his or her interest in the assets. *See In re Allied Gen. Agency*, 229 B.R. at 196.  In 1998, the court in *In re Allied Gen. Agency* was faced with a similar argument: that the tracing requirement is not an absolute prerequisite to the imposition of a constructive trust.  That court found that "[i]n light of the Arizona cases which require tracing . . . Arizona courts would not adopt the [argument asserted by the appellant that tracing is not required]." *Id.* at 197 (citing *Pioneer Annuity Life Ins. Co. v. National Equity Ins. Co.*, 159 Ariz. 148, 150, 765 P.2d 550, 556 (Ariz.App.1988); *Johnson*, 126 Ariz. at 222, 613 P.2d at 1279; *Barrasso*, 122 Ariz. at 471, 595 P.2d at 1016; *Amtitle Trust*, 25 Ariz.App. at 184, 541 P.2d at 1168.  The Court finds this

persuasive and accordingly agrees that the Gedalias must be able to trace their money into LHG's hands by clear and convincing evidence.  The Gedalias do not contend that the Court's factual findings, that the Gedalias did not trace their money into LHG's hands, was erroneous. Therefore, the Court does not make a determination as to whether or not the Bankruptcy Court erred in its findings.

The Bankruptcy Court did not err in its finding that under Arizona Law there is a tracing requirement to establish a constructive trust.  Accordingly, this Court affirms the dismissal of the Gedalias' claims against LHG.

### 4.   *Did the Bankruptcy Court Abuse its Discretion when it awarded Costs to LHG?*

LHG filed a Bill of Costs with the Bankruptcy Court in which they asked for a total of $33,871.55. (AER at 319:2.)  The total amount of costs awarded by the Bankruptcy Court was $11,317.69.  (*Id.* at 323:3–13.)  The Gedalias appeal the following costs: (1) necessary transcript costs of $2,386.00; (2) printing fees of $1,554.31; (3) witness fees of $1,506.67; (4) exemplification and copy fees of $50.00; and (5) deposition costs of $5,759.71. (AOB. at 46:14–49:26.)

The Gedalias argue that LHG was not entitled to these awarded costs because each cost was contrary to the governing local rules or specifically excluded by those rules, or in the alternative, that the costs lacked the required documentation.  LHG contends that the Bankruptcy Court accurately applied 28 U.S.C. § 1920, and Bankruptcy Court Local Rule 7054.

Title 28 U.S.C. § 1920 sets forth the categories of costs that any United States Judge or Clerk of Court may tax. 28 U.S.C. § 1920 (2008).  Bankruptcy Local Rule 7054, which adopts Local Rules 54–1 through 54–14 in full, addresses the ability to award costs in a more specific manner in the District of Nevada.

In the Ninth Circuit, the standard of review when reviewing a lower court's award of costs  is abuse of discretion. *Sea Coast Foods, Inc. v. Lu-Mar Lobster and Shrimp, Inc.*, 260 F.3d 1054, 1058 (9th Cir. 2001).  Fed. R. Civ. P. 54(d)(1) creates a strong presumption in favor

of awarding costs to the prevailing party. *Miles v. State of Cal.*, 320 F.3d 986, 988 (9th Cir. 2003).  Furthermore, the losing party bears the burden of showing why the Court should not award costs. *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003).  With regard to the local rules the Ninth Circuit has stated, "[o]nly in rare cases will we question the exercise of discretion in connection with the application of local rules." *Grove v. Wells Fargo Financial California, Inc.*, 606 F.3d 577, 582 (9th Cir. 2010) (discussing the district court's decision to disallow a taxable cost because the movant failed to strictly comply with the local rules) (citing *United States v. Warren*, 601 F.2d 471, 474 (9th Cir. 1979) (per curiam)).

   **a.   Trial Transcript Fees**

   The Gedalias argue that it was an abuse of discretion for the Bankruptcy Court to award $2,386.00 for trial transcript fees to the LHG.  Local Rule 54–3 states, "[t]ranscripts of pretrial, trial, and post-trial proceedings are not taxable unless either requested by the court or prepared pursuant to stipulation approved by the court."  The Gedalias claim that the parties agreed that they wanted the transcripts and agreed to split the costs and therefore they are not taxable.

   In the Bankruptcy Court's Order in regard to the Bill of Costs, the Court stated that it required a post-trial briefing keyed directly to the transcripts. (AER at 320:10–13.) Additionally, the Bankruptcy Court found that the transcripts were necessary to the efficient and effective administration of this case. (*Id.*)  The language from the order confirms that the Bankruptcy Court requested the transcripts be made since it required a briefing schedule keyed to the transcripts rather than the Gedalias' argument that the parties agreed to order the transcripts.  Accordingly, the transcript costs are taxable under either criteria of Local Rule 54–3 or the more general 28 U.S.C. § 1920.  The Bankruptcy Court did not abuse its discretion when it awarded LHG $2,386.00 for its costs relating to trial transcripts.

   **b.   Printing Fees**

   The Gedalias argue that it was an abuse of discretion for the Bankruptcy Court to award

$1,554.31 for printing/trial exhibit costs to LHG.  The Gedalias cite Local Rule 54–7 for the proposition that only a few types of "difficult-to-replicate" exhibits, *if* admitted into evidence, are taxable. (AOB. at 47:12–14.)  They contend that most of the exhibits were not introduced at trial. (*Id.* at 47:17.)

The Bankruptcy Court relied on 28 U.S.C. § 1920(3) to award the requested printing costs. (AER at 320:17–19.)  Title 28 U.S.C. § 1920(3) states, "[a] judge or clerk of any court of the United States may tax as costs … fees and disbursements for printing . . . ."  The Local Rules do not specifically disallow costs for making a copy of trial exhibits but does give guidelines to follow regarding this cost. LR 54–6(a).

Local Rule 54–7 is not directly on point and neither is 1920(3).  Local Rule 54–7 deals with the costs of reproducing expensive exhibits such as maps, charts, models, photographs, summaries, computations, or statistical summaries.  Instead, the cost of reproducing the trial exhibit binders should be viewed under Local Rule 54–6.  Title 28 U.S.C. §1920(4) allows "[f]ees for exemplification and the costs of making copies of any materials where copies are necessarily obtained for use in the case."  The Bankruptcy Court's finding that these printing fees were related to "copying, and producing necessary trial binders and exhibits" results in the conclusion that the costs were properly allowed under 28 U.S.C. §1920(4) and is not in conflict of LR 54-6.  Accordingly, the Bankruptcy Court did not abuse its discretion when it awarded LHG $1,554.32 for its costs relating to printing/trial exhibits.

### c.    Witness Fees

The Gedalias argue that it was an abuse of discretion for the Bankruptcy Court to award $1,466.67 for witness fees because LHG did not establish that Scott Gibson traveled "at the most economical rate reasonably available" and because the local rules do not contemplate a video conference link to be a reimbursable cost.  Furthermore, the Gedalias argue that LHG did not furnish any "receipt or other evidence of actual cost."  Both elements of 28 U.S.C. § 1821

are considered to be critical according to the Gedalias. (AOB at 47:20–48:17.)

The Fifth Circuit in *Holmes v. Cessna Aircraft Co*. allowed witness fees pursuant to 28 U.S.C. §1821(c)(1) based on counsel's sworn statement that he was familiar with the costs of the case, that all costs were actually incurred, and, additionally, the attorney submitted an itemized statement showing the specific amounts claimed as travel expenses. *Holmes v. Cessna Aircraft Co.*, 11 F.3d 63, 65 (5th Cir. 1994).  In a *per curiam* opinion the court stated, "[w]e believe that this affidavit presents sufficient evidence to meet the requirements of 28 U.S.C. §1821(c)(1)." *Id*.

*Holmes* is analogous to the instant case.  Mr. Cohon, LHG's attorney, signed the Bill of Costs under penalty of perjury, signifying that all of the stated costs were true to the best of his knowledge. (AER at 173–176.)  Furthermore, it is apparent after the review of Gibson's travel expenses that all of the costs were reasonable: (1) roundtrip airfare from Tucson, Arizona to Las Vegas, Nevada, $301.20; (2) airport parking, $15.50, (3) taxi fare, $66.00 and (4) meals, $51.00.

The other witness fee that was allowed by the court was the cost associated with the video conference which allowed Mr. Amiran to testify from Mexico City, Mexico.  It was reasonable for the bankruptcy judge to determine that this cost was "appropriate and adequately documented" because a similar cost would probably have been incurred had Mr. Amiran traveled to Las Vegas to be a witness at trial.  Gibson's declaration is sufficient to satisfy the requirement of documentation.

Therefore, it was not an abuse of discretion to allow $1,466.67 in witness fees under 28 U.S.C. §1821.

### d.   Exemplification Fees

The Bankruptcy Court awarded LHG $50.00 for "the cost for obtaining and using a certified copy of Arthur Dwayne Martin's Nevada licensing documents," and the Gedalias argue that this was an abuse of discretion. (AOB at 322:2–6.)  The Bankruptcy Court citied to 28

U.S.C. § 1920(4) in finding that this exemplification cost is properly taxable. (*Id.* at 322:1.)

The Gedalias point out that LHG's counsel used Arthur Dwayne Martin's licensing documents printed from the internet and that LHG never pointed to a certified copy, admitted into evidence. (AOB. at 48:21–49:4.)  The Gedalias argue that Local Rule 54–6(a) only allows "one (1) copy of a document . . . when the copy is *admitted into evidence* in lieu of an original because the original is either not available or is not introduced at the request of opposing counsel."  This portion of the local rule does not deal with exemplification costs.  Exemplification is "[a]n official transcript of a public record, authenticated as a true copy for use as evidence." BLACK'S LAW DICTIONARY 653 (9th ed. 2009).  The portion of the local rule that deals with this fee states: "[t]he fee of an official for certification or proof regarding non-existence of a document is taxable."  Therefore, the cost of certification or exemplification is taxable.

Finally, the Gedalias erroneously argue that the date of the invoice, November 3, 2009, is evidence that the document was not used during trial because November 3, 2009, was after the trial ended.  However, the Gedalias missed the relevant date on the invoice, September 9, 2009, the date that the cost was incurred. (AER at 222.)  September 9, 2009 preceded the beginning of the trial. (AER at 147:18–19.)

The Gedalias have not made a compelling case that the Bankruptcy Court abused its discretion in granting the $50.00 to LHG for exemplification costs.

### e.   Deposition Costs

Finally, the Gedalias argue that it was an abuse of discretion for the Bankruptcy Court to award $3,814.59 for exemplification fees to LHG because documentation was not provided for deposition costs relating to Suzie Gedalia, Isaac Gedalia, Arthur Dwayne Martin, and M&I Bank.  Also, the documentation that was provided for Chip Shaw, Christopher Linscott, and Moshe Gedalia's depositions shows that some of the costs should not have been included. (AOB

at 49:11–19.)

The Bankruptcy Court ruled that the costs submitted were allowed under 28 U.S.C. § 1920(2).  Local Rule 54–4 covers the allowable costs of depositions.  The rule is rather broad and states that the deposition costs claimed must be reasonable. (LR 54–4.)  The declaration of Cohon is enough proof that the claimed costs were incurred.

Next, the Gedalias argue that "it was not 'reasonable' to allow the cost of this particular translator's air travel from and to Los Angeles, since LHG failed to demonstrate any efforts to locate a local Hebrew translator."  The Bankruptcy Court found that the interpreter was necessary and reasonable and therefore there was no abuse of discretion in allowing this cost.

Finally, the Gedalias argue that the Court erred in granting LHG's counsel's fees and expenses related to the depositions. The $651.92 of that total was an award of costs for LHG's counsel to travel to the depositions. (AER at 176:1–2, 176:10–11.)  Local Rule 54–4 states, "[c]ounsel's fees, expenses, in arranging for taking a deposition, and expenses in attending the deposition are not taxable, except as provided by statute or by the Federal Rules of Civil Procedure."  The Bankruptcy Court did not cite to any authority that would allow LHG's counsel to recover costs relating to his own travel.  Therefore, the Court finds that it was an abuse of discretion to allow this cost.  Thus, the total amount of deposition costs recoverable by LHG is reduced by $651.92 so that the total amount awarded should now be $5,143.79.[7]

## CONCLUSION

**IT IS HEREBY ORDERED** that the Court **AFFIRMS, in part,** and **REVERSES in part,** the Bankruptcy Court's Decision and Judgment as stated in this Order.

/ / /

---

[7] Correctly, the Gedalias point out that the Bankruptcy Court made a factual error when it said, "[i]ncluded in this cost is the cost of Ron Amiran's video testimony at trial." (AER at 322:13–14.) No costs related to Ron Amiran are included in the deposition itemized cost list.  All costs relating to Ron Amiran's video link testimony were awarded in the witness fee section of the Bill of Costs and this error has no impact on the total amount of costs awarded by the Bankruptcy Court.

The Court **REVERSES** the Bankruptcy Court's award of costs and **REMANDS** to the Bankruptcy Court to award costs in accordance with this Order.

DATED this 29th day of December, 2011.

_____
Gloria M. Navarro
United States District Judge